UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

BURLINGTON DIVISION

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JAN 27 PM 3: 57

CLERK

BY_____
DEPUTY CLERK

|  |  |  |
|---|---|---|
| KYLE MONTANIO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. No. 5 : 16 - cv - 19 |
|  | ) | **CLASS ACTION** |
| Plaintiff, | ) ) |  |
| vs. | ) ) ) | DIRECT SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |
| KEURIG GREEN MOUNTAIN, INC., BRIAN P. KELLEY, NORMAN H. WESLEY, BARBARA D. CARLINI, JOHN D. HAYES, A.D. DAVID MACKAY, MICHAEL J. MARDY, HINDA MILLER, DAVID E. MORAN, JOSÉ OCTAVIO REYES LAGUNES, SUSAN SALTZBART KILSBY, ROBERT A. STEELE, JAB HOLDINGS B.V., ACORN HOLDINGS B.V. and MAPLE HOLDINGS ACQUISITION CORP., | ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) | **DEMAND FOR JURY TRIAL** |

Plaintiff Kyle Montanio ("plaintiff"), by and through undersigned counsel, brings this Direct Shareholder Class Action Complaint for Violations of the Securities Exchange Act of 1934 (the "1934 Act") against the herein-named defendants, and upon information and belief, based upon, *inter alia*, the investigation of counsel, plaintiff alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

1. Plaintiff brings this direct shareholder class action individually and on behalf of the other public shareholders of Keurig Green Mountain, Inc. ("Keurig" or the "Company"), against Keurig, the Company's Board of Directors (the "Board" or the "Individual Defendants"), and a consortium of investors led by JAB Holdings B.V. ("JAB Holdings") (collectively, the "Buyout Group," and together with Keurig and the Board, "Defendants"), arising out of Defendants' dissemination of a materially false and misleading proxy statement in violation of §§14(a) and 20(a) of the 1934 Act, 15 U.S.C. §§78n(a) and 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9, in connection with the proposed buyout of Keurig, which will take the Company private and strip shareholders of their investment for inadequate consideration (the "Proposed Buyout"). Plaintiff seeks equitable relief only, specifically, to enjoin the February 24, 2016 shareholder vote on the Proposed Buyout until Defendants disclose material information regarding the transaction that they are withholding from plaintiff and the proposed class of Keurig shareholders (the "Class").

2. Keurig, a Delaware Corporation headquartered in Waterbury, Vermont, is a leading manufacturer and seller of beverage brewing system for home and commercial use, as well as related consumables, the "K-Cup" pod, which contains a single brew of coffee. In September 2015, Keurig entered the cold-beverage market with the launch of Keurig Kold.

3. On December 7, 2015, Defendants announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which the Buyout Group will

purchase all outstanding shares of Keurig common stock for $92.00 per share in cash (the "Merger Consideration").

4. The Proposed Buyout is merely an attempt by the Buyout Group to acquire Keurig for a bargain during a temporary downturn in the Company's stock price. Indeed, the Merger Consideration substantially undervalues the Company as Keurig stock traded as high as $154.27 – $62.27 above the Merger Consideration – on November 14, 2014. Moreover, the Company is poised for continued growth and success, and its stock price will soon rebound to, once again, trade above the inadequate Merger Consideration. To be sure, Keurig only recently launched the Keurig Kold system, which Keurig management has projected to perform very well, even *surpassing the revenue from Keurig's traditional "hot" business* by the year 2022.

5. Because Keurig Kold was projected to perform so well, senior management was forced to lower Keurig's overall value by manipulating its own projections in order to accept JAB Holdings' offer. Without any disclosure of the underlying discussions or reasoning behind this critically important decision affecting the value of the entire Company, management recommended, and the Board agreed, to apply a *50% probability weighting* to the Keurig Kold business as an "appropriate modification." Even small adjustments to the probability weighting applied to Keurig Kold results in substantial changes in the valuation of the Company. A sensitivity analyses performed by one of the Board's financial advisors, BofA Merrill Lynch, shows that without management's baseless 50% haircut, Keurig could be worth as much *as $145.25 per share*. Defendants have provided no explanation as to why a drastic 50% haircut is an "appropriate modification" to Keurig Kold's projected success.

6. In preparation for a sale of the Company to the Buyout Group, the Board also hired a second financial advisor, Credit Suisse, because the Board's "long-standing" advisor, BofA Merrill

Lynch, had substantial business relationships with JAB Holdings and its affiliates through which the bank collected $100 million in fees during the past two years alone, presenting a conflict of interest.

7. While Keurig shareholders are being stripped of their equity investment in the Company for inadequate consideration, senior management will retain their lucrative employment positions with the Company after the Buyout Group takes Keurig private. Moreover, the Board and senior management will receive substantial financial windfalls from the accelerated vesting of their equity awards. These payments amount to as much as *$10.9 million dollars* for defendant Brian P. Kelley ("Kelley"), the Company's President and Chief Executive Officer ("CEO") who also serves on the Board, and *$13.3 million* for defendant Barbara D. Carlini ("Carlini").

8. In selling Keurig to the Buyout Group, the Board and senior management made no efforts to seek out a higher offer for the Company and even shunned unsolicited proposals from "Party X," which proposed a deal with Keurig that would provide a "premium" for shares of Keurig common stock, which at the time were trading at *$129.00 per share*.

9. To make matters worse, the Board members ensured that no topping bidder would emerge to offer more value to the Company's shareholders by agreeing to a number of preclusive provisions in the Merger Agreement designed to make Keurig a financially unattractive acquisition candidate (the "Lockup Provisions"). Specifically, the Board locked up the sale of the Company to the Buyout Group by agreeing to: (a) a strict no-solicitation provision that prevents the Company or its employees from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (b) rapid information rights that require Keurig to share highly sensitive information about potential bidders with the Buyout Group and requires the Company to notify the Buyout Group orally and in writing within 24 hours after receipt of an acquisition proposal or inquiry; (c) a provision that provides the Buyout Group with the opportunity to match any

competing proposal in the event one is made; (d) a provision that prohibits the Board from withdrawing or modifying its recommendation of the Proposed Transaction except in narrowly prescribed circumstances; and (e) a provision that requires the Company to pay a termination fee of $475 million if the Merger Agreement is terminated in certain circumstances. These provisions, taken collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

10.     Then, on December 24, 2015, and again on January 12, 2016, Defendants filed a materially false and misleading preliminary proxy statement with the SEC on Schedule 14A (the "Proxy") in violation of §§14(a) and 20(a) of the 1934 Act. The Proxy, which recommends that Keurig shareholders vote in favor of the Proposed Buyout, fails to disclose material information regarding the negotiation and approval of the deal, which deprives the Company's shareholders of their right to cast an informed vote. For example, the Proxy fails to disclose the following material information, which renders statements made in the Proxy materially false and/or misleading: (a) discussions and reasoning underlying the 50% probability weighting applied to Keurig Kold; (b) details of discussions between senior management and JAB Holdings; (c) information regarding Keurig's inherent value and prospects as a standalone company; (d) discussions and reasoning underlying the Board's failure to seek out other bidders; (e) information and discussions regarding conflicts of interest with respect to BofA Merrill Lynch and Credit Suisse; and (f) material assumptions and metrics underlying the valuation analyses performed by BofA Merrill Lynch and Credit Suisse.

11.     In sum, Defendants violated the federal securities laws, including §§14(a) and 20(a) of the 1934 Act, in connection with the recommendation of the Proposed Buyout. Defendants' actions threaten Keurig shareholders with irreparable harm for which money damages are not an

adequate remedy. Thus, plaintiff seeks injunctive relief to ensure that Defendants cure Defendants' violations of federal law before Keurig shareholders are forced to vote on the Proposed Buyout.

12.     Plaintiff and the other members of the Class have no adequate remedy at law. The shareholder vote on the Proposed Buyout has been scheduled for February 24, 2016. Therefore, time is of the essence to protect Keurig shareholders from the irreparable harm with which they are threatened.

## PARTIES

### *Plaintiff*

13.     Plaintiff is, and at all relevant times was, a shareholder of Keurig common stock and has had continuous and uninterrupted ownership of his shares of Keurig common stock since prior to the time of the wrongdoing alleged herein.

### *Keurig*

14.     Defendant Keurig Corporation is a Delaware corporation with its corporate headquarters located at 33 Coffee Lane, Waterbury, Vermont 05676. The Company's stock is publicly traded on the New York Stock Exchange under the ticker symbol "GMCR." Keurig is a leader in coffeemakers and specialty coffee in the United States and Canada. The Company manufactures and sells beverage brewing systems for home and commercial use, as well as related consumables, such as the "K-Cup" pod, which is a container that provides a single-serving of coffee. In September 2015, Keurig entered the cold-beverage market with the launch of Keurig Kold.

### *The Individual Defendants*

15.     Defendant Kelley is, and at all material times was, President and CEO of Keurig and a member of the Board.

16.     Defendant Norman H. Wesley ("Wesley") is, and at all material times was, Chairman of the Board.

- 5 -

17. Defendant Carlini is, and at all material times was, a member of the Board.

18. Defendant John D. Hayes is, and at all material times was, a member of the Board.

19. Defendant A.D. David Mackay is, and at all material times was, a member of the Board.

20. Defendant Michael J. Mardy is, and at all material times was, a member of the Board.

21. Defendant Hinda Miller is, and at all material times was, a member of the Board.

22. Defendant David E. Moran is, and at all material times was, a member of the Board.

23. Defendant José Octavio Reyes Lagunes is, and at all material times was, a member of the Board.

24. Defendant Susan Saltzbart Kilsby is, and at all material times was, a member of the Board.

25. Defendant Robert A. Steele is, and at all material times was, a member of the Board.

26. The Defendants identified in ¶¶15-25, above, are at times collectively referred to herein as the "Board" or the "Individual Defendants."

### *The Buyout Group Defendants*

27. Defendant JAB Holdings is a private limited liability company incorporated under the laws of the Netherlands.

28. Defendant Acorn Holdings B.V. is a private limited liability company incorporated under the laws of the Netherlands and is owned by an investor group led by JAB Holdings and is the holding company of Jacobs Douwe Egberts, a global coffee and tea company.

29. Defendant Maple Holdings Acquisition Corp. is a Delaware corporation and a wholly-owned subsidiary of defendant Acorn Holdings B.V. formed solely for the purpose of effectuating the Proposed Buyout.

30.     Defendants JAB Holdings, Acorn Holdings B.V., and Maple Holdings Acquisition Corp. are collectively referred to herein as the "Buyout Group."

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa, because the claims asserted herein arise under §§14(a) and 20(a) of the 1934 Act, 15 U.S.C. §78n(a) and §78t(a). Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).

32.     This Court has personal jurisdiction over each defendant named herein because each defendant is an individual, corporation, or partnership that has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## SUBSTANTIVE ALLEGATIONS

### *Summary of the Deep-Rooted Relationships Between Keurig, JAB Holdings, and BofA Merrill Lynch*

33.     Keurig manufactures and sells beverage brewing system for home and commercial use, as well as consumable "K-Cup" pods, which contain a single-serving of coffee.

34.     Keurig has a long-standing relationship with JAB Holdings through which Keurig sells "Peet's and Caribou" brand K-Cups, a brand owned by JAB Holdings.

35.     The Proxy states that BofA Merrill Lynch is Keurig's "long-standing" financial advisor. BofA Merrill Lynch, also has a substantial business relationship with JAB Holdings. As stated in the Proxy, BofA Merrill Lynch has earned *$100 million* in fees for work performed for JAB Holdings, and members of the Buyout Group and their affiliates, in the past two years alone.

### *Background of the Deficient Sales Process for the Company*

36.    The Proxy states that "[i]n the summer of 2014, the Board determined that it would be beneficial to have the additional perspective of another financial advisor, and Credit Suisse began to provide strategic advice to Keurig along with BofA Merrill Lynch."

37.    On January 19, 2015, Kelley was approached by the Chairman and CEO of Party X who suggested a combination of the two companies in a transaction that would deliver "a premium" for shares of Keurig common stock, which at the time were trading at $129.00 per share. Kelley responded that Keurig was not for sale.

38.    During Board meetings on January 29 and 26, 2015, the Board discussed Party X's proposal and purportedly concluded that it was not the right time to explore a sale or merger of Keurig because of "value creation potential from the long-term growth of the Keurig® hot system, the anticipated launch of the Keurig® Kold™ system later in 2015 and subsequent opportunities to provide products in other high-margin cold beverage categories using the Kold™ system[.]" The Board determined to reject Party X's overture during a special telephonic meeting held on February 6, 2015. The Proxy does not disclose any discussions regarding the appropriate probability weighting for Keurig Kold, the anticipated launch of which purportedly supported the Board's decisions to reject Party X's proposal.

39.    During a Board meeting on June 22, 2015, the Proxy states that "Kelley informed the Board that the Chairman and Chief Executive Officer of Party X had recently again inquired about a potential acquisition of Keurig by Party X." The Proxy further states that "Mr. Kelley advised the Board that he had informed Party X's Chairman and Chief Executive Officer that Mr. Kelley was not in a position to discuss any transaction of that nature without first discussing the topic with the Board and that the Chairman and Chief Executive Officer of Party X thereupon ceased pursuing further conversations on the point." The Proxy fails to disclose any details of Party X's second

- 8 -

overture, including whether Party X proposed a specific value, or any other terms of a potential combination between the two companies.

40. The Proxy states that on July 12, 2015, Kelley purportedly received an unsolicited phone call from Olivier Goudet ("Goudet"), CEO of JAB Holdings, to schedule a meeting.

41. On July 21, 2015, Kelley and Keurig's CFO at the time, Frances Rathke ("Rathke"), met with Goudet. The Proxy discloses no details of the discussions at that meeting other than a purported vague statement from Mr. Goudet that "further developing a relationship with Keurig was a top priority of JAB Holding."

42. The Proxy states that at a regularly scheduled Board meeting on July 30, 2015, which was attended by members of senior management, Kelley updated the Board on "planned conversations" with Goudet. But the Proxy fails to disclose the underlying discussions between Kelley and Goudet that led to those "planned conversations."

43. On August 26 and 27, 2015, the Board met with members of senior management. The Proxy states that in preparation for those meetings, "management updated certain financial projections that had initially been prepared for and shored only with financing sources in connection with Keurig's new credit facility earlier in 2015[,]" and that those revised projections were provided to the Board.

44. On August 28, 2015, Kelley and Rathke met with Goudet, purportedly to discuss "Keurig's partnership with Peet's and Caribou with respect to K-Cup® pods and opportunities for growing that business." During that meeting, Goudet purportedly expressed JAB Holdings' "ongoing interest in further developing a relationship with Keurig." Kelley purportedly informed Goudet that Keurig was not for sale.

45. On September 29, 2015, Keurig began its formal launch of the Keurig Kold system.

46.     On October 7, 2015, Goudet called Kelley to propose a dinner meeting and stated that he had a "very compelling" proposal to make.

47.     On October 15, 2015, Wesley and Kelley met with Goudet who communicated JAB Holdings' interest in exploring a potential acquisition of Keurig for $85.00 in cash per share of Keurig common stock. Goudet also purportedly indicated that JAB Holdings would withdraw if Keurig contacted any third parties in an attempt to generate any competing interest.

48.     On October 19, 2015, the Board held a special telephonic meeting attended by members of senior management. The attendees discussed JAB Holdings' offer but determined that it was too low. The Proxy does not disclose any discussions regarding the Board's determination to proceed with a single-bidder strategy at this point.

49.     On October 27, 2015, Wesley and Kelley met with Goudet who orally communicated JAB Holdings' revised interest in exploring a potential acquisition of Keurig for $88.00 in cash per share of Keurig common stock.

50.     On November 12, 2015, the Board held a special in person meeting to discuss JAB Holdings' indication of interest. Management revised the August 2015 financial projections made available to the Board just three months earlier and, for apparently the first time, discussed applying a probability weighting to their own projections that would lower the value of Keurig Kold and the Company. The Proxy fails to disclose any of those discussions regarding the probability weighting that management and the Board discussed applying.

51.     On November 19, 2015, the Board held a special telephonic meeting at which members of senior management were present. After discussion, the Board authorized management to explore a potential acquisition by JAB Holdings of Keurig.

52.     On November 20, 2015, Wesley, Kelley, and Kilsby called Goudet and informed him that JAB Holdings' indication of interest to acquire Keurig for $88.00 in cash per share of Keurig common stock undervalued Keurig.

53.     On November 29, 2015, Wesley, Kelley, and Kilsby met with Goudet, and JAB Holdings representatives indicated that JAB Holdings was prepared to pay $90.00 to $91.50 in cash per share of Keurig common stock to acquire Keurig. Wesley, Kelley, and Kilsby countered with a suggested range of $91.50 to $92.50 in cash per share of Keurig common stock. Following a recess, JAB Holdings' principals indicated that JAB Holdings was prepared to pay $92.00 in cash per share of Keurig common stock.

54.     On December 1, 2015, the Board held a special telephonic meeting at which members of senior management were present. At that meeting, the Proxy states that "[t]he Board then focused on the probability weighting used in connection with scenarios regarding Keurig's Kold™ business." The Proxy further states that "[m]anagement recommended a 50% probability weighting for Keurig's Kold™ business in the fiscal year ending September 25, 2021 and subsequent fiscal years as an appropriate adjustment given the risks associated with the launch of the new platform." The Proxy further states that "[t]he Board agreed with management's recommendation and directed BofA Merrill Lynch and Credit Suisse to use the 50% probability weighting for Keurig's Kold™ business as discussed in connection with their respective financial analyses and opinions." The Proxy does not disclose any of the discussions or reasoning underlying management's recommendation of a 50% probability weighting as an "appropriate adjustment" to Keurig Kold, or the Board's agreement with that decision.

55.     The Proxy states that "[a]fter discussion, it was the consensus of the Board . . . to continue with the single bidder strategy." The Proxy does not disclose why the Board waited until

six months after JAB Holdings' initial indication of interest to discuss reaching out to other potential bidders. The Proxy states that the Board believed that "other potentially interested parties would not likely consummate a transaction at a price higher than the merger consideration[.]" The Proxy does not disclose the basis for the Board's belief, particularly in light of the two expressions of interest from Party X that offered a premium for shares of Keurig common stock, which at the time were trading at $129.00 per share.

56.     At a December 6, 2015 meeting, the Board reaffirmed its direction to its financial advisors to apply, as recommended by management, a 50% probability weighting for Keurig Kold. That evening, the parties executed the Merger Agreement, and on December 7, 2015, Keurig and JAB Holdings issued a joint press release announcing the execution of the merger agreement.

### The Board and Senior Management Prepared
### For a Sale of the Company to the Buyout Group

57.     The Proxy states that "[i]n the summer of 2014, the Board determined that it would be beneficial to have the additional perspective of another financial advisor." The Proxy does not disclose why the Board believed that it would be beneficial to have a second financial advisor if the Company were not for sale, which is what Kelley told the CEO of Party X shortly after Credit Suisse began providing strategic advice to Keurig.

58.     The Board's true motivation in reaching out to Credit Suisse is clear. The Board and senior management wanted to sell Keurig to the Company's long-standing business partner, JAB Holdings, in a deal that would provide senior management with lucrative cash outs of their equity awards and continued employment with the Company. BofA Merrill Lynch, however, the Board's "long-standing" advisor, had significant business relationships with JAB Holdings, having received $100 million in fees from JAB Holdings and its affiliates over the last two years alone, which presented a conflict of interest. Therefore, in order to prepare for a sale of the Company to the

Buyout Group, the Board began receiving advice from Credit Suisse in the "summer of 2014." That explains why on January 19, 2015, shortly after the "summer of 2014" when the Board began to receive advice from a second financial advisor, Kelley confidently told the CEO of Party X, which offered a premium to the Company's then-current $129.00 share price, that Keurig was not for sale.

59.    While Kelley and the Board were unwilling to even explore Party X's proposal, Kelley held numerous discussions with Goudet, the CEO of JAB Holdings, the intended buyer. Those discussions are disclosed in the Proxy only in passing, or not at all. For example, the Proxy discloses a July 21, 2015 meeting between Kelley, Rathke, and Goudet, but the Proxy contains no details regarding the discussions at that meeting other than Goudet's purported vague statement that "further developing a relationship with Keurig was a top priority of JAB Holding." The Proxy also includes Kelley's reference to "planned conversations" with Goudet, but the Proxy fails to disclose the underlying discussions that led to those "planned conversations."

60.    Once the Board and senior management realized that JAB Holdings was unwilling to pay fair value for the Company, the Board and senior management scrambled to lower the Company's value. Without any discussion or reasoning underlying this critically important decision, management recommended a 50% haircut chopped off Keurig Kold's value as an "appropriate adjustment." Even slight changes to the probability weighting for Keurig Kold substantially impact the value of the Company. As BofA Merrill Lynch's sensitivity analysis demonstrates (Proxy at 51), without management's baseless 50% haircut, Keurig could be worth as much as *$145.25 per share*.

## *Management Negotiated Financial*
## *Windfalls for Keurig Insiders*

61.    While Keurig shareholders are being stripped of their equity investment in the Company for inadequate consideration, senior management will retain their lucrative employment positions with the Company after the Proposed Buyout. Moreover, the Board and senior

- 13 -

management will receive lucrative financial payments from the accelerated vesting of their equity awards. These payments amount to as much as **$10.9 million dollars** for Kelley, the Company's President and CEO, and **$13.3 million** for Carlini:

### Director Equity Summary Table

| Directors | RSU Awards (#)(1) | RSU Awards ($)(1) | Stock Options (#)(2) | Stock Options ($)(2) | Phantom Stock Units (#)(3) | Phantom Stock Units ($)(3) | Estimated Total Cash Consideration |
|---|---|---|---|---|---|---|---|
| Norman H. Wesley | 165 | $ 15,180 | 5,237 | $ 343,500 | 3,013 | $ 278,175 | $ 636,855 |
| Barbara D. Carlini | 84 | $ 7,728 | 124,857 | $ 10,484,914 | 31,078 | $ 2,869,276 | $ 13,361,919 |
| John D. Hayes | — | $ — | 633 | $ 9,406 | 2,247 | $ 207,454 | $ 216,860 |
| A. D. David Mackay | — | $ — | 1,654 | $ 64,721 | — | $ — | $ 64,721 |
| Michael J. Mardy | 84 | $ 7,728 | 33,957 | $ 2,465,095 | — | $ — | $ 2,472,823 |
| Hinda Miller | 84 | $ 7,728 | 1,684 | $ 59,426 | 19,035 | $ 1,757,406 | $ 1,824,560 |
| David E. Moran | 84 | $ 7,728 | 64,857 | $ 5,190,064 | — | $ — | $ 5,197,792 |
| José Octavio Reyes Lagunes | — | $ — | — | $ — | — | $ — | $ — |
| Susan Saltzbart Kilsby | — | $ — | 633 | $ 9,406 | — | $ — | $ 9,406 |
| Robert A. Steele | — | $ — | 637 | $ 8,714 | — | $ — | $ 8,714 |

### Executive Officer Unvested Equity Awards Summary Table

| Executive Officers | PSU Awards (#)(1) | PSU Awards ($)(1) | RSU Awards (#)(2) | RSU Awards ($)(2) | Unvested Stock Options (#)(3) | Unvested Stock Options ($)(3) | Estimated Total Cash Consideration |
|---|---|---|---|---|---|---|---|
| Brian P. Kelley* | 41,502 | $ 3,818,184 | 29,694 | $ 2,731,848 | 127,914 | $ 4,383,657 | $ 10,933,689 |
| Michael J. Degnan | 3,472 | $ 319,424 | 17,730 | $ 1,631,160 | 20,424 | $ 650,960 | $ 2,601,544 |
| Stephen L. Gibbs | 1,634 | $ 150,328 | 3,693 | $ 339,756 | 10,650 | $ 333,138 | $ 823,222 |
| Stéphane Glorieux | 1,303 | $ 119,876 | 2,647 | $ 243,524 | 10,334 | $ 258,756 | $ 622,156 |
| Peter G. Leemputte | 6,282 | $ 577,944 | 17,032 | $ 1,566,944 | 31,616 | $ 1,233,656 | $ 3,378,544 |
| Linda Longo-Kazanova | 2,575 | $ 236,900 | 5,645 | $ 519,340 | 16,778 | $ 525,043 | $ 1,281,283 |
| Robert P. Ostryniec | 7,106 | $ 653,752 | 17,477 | $ 1,607,884 | 35,076 | $ 1,011,057 | $ 3,272,693 |
|  | 63,874 | $ 5,876,408 | 93,918 | $ 8,640,456 | 252,792 | $ 8,396,267 | $ 22,913,131 |

62. These benefits will not be shared equally with the Class.

### The Board Agreed to Preclusive Lockup Provisions
### Designed to Discourage Other Potential Bidders

63. The Board ensured that no topping bidder would emerge to offer a better deal to the Company's shareholders by agreeing to a number of preclusive Lockup Provisions in the Merger Agreement designed to make Keurig a financially unattractive acquisition candidate. Specifically, the Board locked up the sale of the Company to the Buyout Group by agreeing to: (a) a strict no-solicitation provision that prevents the Company or its employees from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (b) rapid information rights that require Keurig to share highly sensitive information about potential bidders with the Buyout Group and requires the Company to notify the Buyout Group orally and in writing within 24 hours after receipt of an acquisition proposal or inquiry; (c) a provision that provides the Buyout Group with the opportunity to match any competing proposal in the event one is made; (d) a provision that prohibits the Board from withdrawing or modifying its recommendation of the Proposed Buyout except in narrowly prescribed circumstances; and (e) a provision that requires the Company to pay a termination fee of $475 million if the Merger Agreement is terminated in certain circumstances. These provisions, taken collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

### Defendants Issued a Materially False and Misleading
### Proxy in Support of the Proposed Buyout

64. In an attempt to secure shareholder approval of the Proposed Buyout, Keurig filed – following review, editing, and approval by the Board and the Buyout Group – a materially false and misleading Proxy with the SEC, in direct contravention of §§14(a) and 20(a) of the 1934 Act, on December 24, 2015 and January 12, 2016. While the Proxy recommends that shareholders vote in favor of the Proposed Buyout, Defendants omitted and/or misrepresented material information

regarding the Proposed Buyout in order to make it more likely that Keurig's public shareholders would be coerced and misled into voting in favor of the Proposed Buyout without that material information regarding the critical decision they face. Due to their joint efforts in preparing, editing, reviewing, approving, and/or disseminating the Proxy, Defendants knew that the Proxy failed to disclose such material information, which rendered other statements made in the Proxy false and/or misleading. The proxy failed to disclose, *inter alia*, the following material information:

65. ***Information regarding the probability of Keurig Kold's success***. The Proxy states that "[o]n November 12, 2015, the Board held a special in-person meeting at the offices of Sidley Austin in Chicago, Illinois to discuss whether Keurig should engage with JAB Holding to further pursue JAB Holding's indication of interest." Proxy at 31. The Proxy further states that "BofA Merrill Lynch and Credit Suisse reviewed with the Board preliminary financial perspectives regarding Keurig's hot business, ***Keurig's Kold™ business based on different probability scenarios regarding the success of that new business and Keurig on a consolidated basis***, as well as preliminary perspectives on JAB Holding and potential alternatives for a return of capital to Keurig's stockholders." *Id.* at 31(emphasis added). The Proxy further states that during a December 1, 2015 Board meeting, "[m]anagement ***recommended a 50% probability weighting for Keurig's Kold™*** business in the fiscal year ending September 25, 2021 and subsequent fiscal years as an appropriate adjustment given the risks associated with the launch of the new platform. The 50% probability-weighted scenario was also deemed by senior management to be appropriate to adjust for the application of Keurig's discount rate (9% to 11%) in calculating the discounted cash flow valuation of the Kold™ business, which was essentially a start-up business (and, thus, would normally be ascribed a much higher discount rate). The Board agreed with management's recommendation and directed BofA Merrill Lynch and Credit Suisse to use the 50% probability weighting for Keurig's

Kold™ business as discussed in connection with their respective financial analyses and opinions." *Id.* at 33-34 (emphasis added). Management's recommendation to apply a 50% probability weighting to Keurig Kold, and the Board's agreement with that recommendation is materially misleading due to Defendants' failure to disclose the discussions amongst management and the Board and the reasoning that purportedly supports the application of a 50% probability weighting to Keurig Kold. Without disclosure of this material information, Keurig shareholders have no ability to assess whether management's recommendation is appropriate and supported by reasonable considerations rather than an arbitrary 50% haircut designed to drive down the value of the Company.

66. ***Details of management discussions with JAB Holdings.*** The Proxy states that during a special telephonic Board meeting on July 16, 2015, "Mr. Kelley reported that on July 12, 2015, he had been contacted by Mr. Olivier Goudet, the Chief Executive Officer of JAB Holding, to schedule a meeting." Proxy at 29. The Proxy further states that "[o]n July 21, 2015, Mr. Kelley and Ms. Frances Rathke, at the time the Chief Financial Officer of Keurig, and who in August 2015 became a strategic advisor to Keurig, met with Mr. Goudet. During the meeting, Mr. Goudet stated that further developing a relationship with Keurig was a top priority of JAB Holding." *Id.* The Proxy further states that on July 30, 2015, "Kelley also updated the Board on planned conversations with Mr. Goudet. The Board indicated that Mr. Kelley should continue to focus the conversations on the business relationship between the parties." *Id.* The Proxy further states that "[o]n August 28, 2015, Mr. Kelley and Ms. Rathke met with Mr. Goudet to discuss Keurig's partnership with Peet's and Caribou with respect to K-Cup® pods and opportunities for growing that business. During the meeting, Mr. Goudet expressed JAB Holding's ongoing interest in further developing a relationship with Keurig." *Id.* Defendants' failure to disclose any details of management's discussions with

Goudet, including the undisclosed discussions that led to the "planned conversations" with Goudet that Kelley referenced on July 30, 2015, renders the Proxy's statements that Kelley and Goudet discussed only "Keurig's partnership with Peet's and Caribou with respect to K-Cup® pods" materially misleading as, without disclosure of this material information, Keurig shareholders cannot assess whether management acted appropriately in negotiating a sale of the Company.

67. ***Information regarding Keurig's Inherent Value as a Standalone Company.*** The Proxy states in general terms that the Board discussed "potential alternatives for a return of capital to Keurig's stockholders" on November 12, 2015 (Proxy at 31), discussed "alternative valuation scenarios for Keurig's Kold™ business" on November 30, 2015 (Proxy at 33), and reviewed "alternative standalone scenarios" on December 1, 2015 (Proxy at 34). Defendants' failure to disclose the specific "potential alternatives for a return of capital to Keurig's stockholders," the "alternative valuation scenarios for Keurig's Kold™ business," and the "alternative standalone scenarios" that they considered renders the Proxy's recommendation of the Proposed Buyout materially misleading as Keurig shareholders are unable to assess Keurig's inherent value and future prospects in order to determine whether they would be better off if Keurig were to continue operating as an independent, public Company.

68. ***Information regarding the Board's failure to shop the Company.*** The Proxy states that "[o]n January 19, 2015, Mr. Brian P. Kelley, Keurig's President and Chief Executive Officer, was approached by the Chairman and Chief Executive Officer of Party X with a non-specific suggestion about a combination of the two companies in a transaction that would deliver 'a premium' for shares of Keurig common stock[.]" Proxy at 27. The Proxy further states that "[o]n June 22, 2015, the Board held a special telephonic meeting at which members of senior management and a representative of Sidley Austin were present. During the meeting, Mr. Kelley informed the

Board that the Chairman and Chief Executive Officer of Party X had recently again inquired about a potential acquisition of Keurig by Party X." *Id.* at 28. Yet the Proxy later states that the Board believed that "other potentially interested parties would not likely consummate a transaction at a price higher than the merger consideration and provide similar value certainty[.]" *Id.* at 37. Defendants' failure to disclose the basis for this belief, particularly in light of the expressions of interest from Party X, which offered more value than the Buyout Group's ultimate offer, renders the Proxy's statement regarding the Board's purported belief "other potentially interested parties would not likely consummate a transaction at a price higher than the merger consideration and provide similar value certainty[,]" materially misleading as, without disclosure of this material information, Keurig shareholders cannot determine whether the Proposed Buyout, in fact, represents the highest value attainable for their shares of the Company.

69. ***Details regarding the Board's engagement of Credit Suisse***. The Proxy states that "[i]n the summer of 2014, the Board determined that it would be beneficial to have the additional perspective of another financial advisor, and Credit Suisse began to provide strategic advice to Keurig along with BofA Merrill Lynch." Proxy at 27. The Proxy further states that shortly thereafter, "[o]n January 19, 2015, Mr. Brian P. Kelley, Keurig's President and Chief Executive Officer, was approached by the Chairman and Chief Executive Officer of Party X with a non-specific suggestion about a combination of the two companies in a transaction that would deliver 'a premium' for shares of Keurig common stock[.]" *Id.* The Proxy further states that "Mr. Kelley informed the Chairman and Chief Executive Officer of Party X that Keurig was not looking to be sold[.]" Defendants' failure to disclose the basis for its determination that "it would be beneficial to have the additional perspective of another financial advisor," as well as the exact date in the "summer of 2014" that "Credit Suisse began to provide strategic advice to Keurig" renders those

statements misleading as, without disclosure of this material information, Keurig shareholders cannot assess whether the Board was motivated by a desire to sell the Company to JAB Holdings, including how soon after Credit Suisse began to provide strategic advice that Kelley informed Party X that Keurig was not for sale.

70.     ***Discussions underlying the potential bonus payment for BofA Merrill Lynch and Credit Suisse***. The Proxy discloses certain that "the Board accepted updated information regarding the material relationships of BofA Merrill Lynch and Credit Suisse, which had been provided to the Board in advance of the meeting and an earlier version of which had been provided to Keurig in November 2015. The updated information included the matters described in the sections of this proxy statement entitled '– Opinions of Our Financial Advisors – Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated – Miscellaneous,' beginning on page 51, and '– Opinions of Our Financial Advisors – Opinion of Credit Suisse Securities (USA) LLC – Miscellaneous,' beginning on page 61." Proxy at 35. The Proxy further states that Keurig has agreed to consider payment of an additional fee of up to $4 million to BofA Merrill Lynch (Proxy at 52) and an additional fee of up to $2 million to Credit Suisse (Proxy at 61) at the sole discretion of Keurig.  Defendants' failure to disclose the discussions underlying the decision to award these additional bonus payments to BofA Merrill Lynch and Credit Suisse, as well as the considerations that would support Keurig's decision to make those payments, renders the Proxy's discussion of the banks' potential conflicts of interests materially misleading as, without disclosure of this material information, shareholders cannot determine whether the additional bonus payments to BofA Merrill Lynch and Credit Suisse are intended to function as incentives for the banks to support the Proposed Buyout.

71. The Proxy also omitted and/or misrepresented the following material information with respect to the fairness opinions prepared by BofA Merrill Lynch and Credit Suisse in contravention of §14(a) and §20(a) of the 1934 Act:

(a) ***The forecasts underlying the bankers' Selected Public Companies analysis***. With respect to the *Selected Public Companies* analysis performed by BofA Merrill Lynch, the Proxy states that "BofA Merrill Lynch noted that the calendar year 2016 estimated Adjusted EBITDA multiples observed for Keurig, ***based on the Keurig Forecasts*** and publicly available research analysts' estimates (as calendarized), were 7.9x and 7.8x, respectively." Proxy at 48 (emphasis added). The Proxy further states that "BofA Merrill Lynch also noted that the calendar year 2016 estimated non-GAAP EPS multiples observed for Keurig, ***based on the Keurig Forecasts*** and publicly available research analysts' estimates (as calendarized), were 15.9x and 15.1x, respectively." *Id.* (emphasis added). The Proxy further states that "BofA Merrill Lynch then applied selected ranges of calendar year 2016 estimated EBITDA multiples and calendar year 2016 estimated EPS multiples of 8.0x to 12.0x and 14.0x to 22.0x, respectively, derived from the selected companies to the fiscal year 2016 estimated Adjusted EBITDA and the fiscal year 2016 estimated non-GAAP EPS of Keurig ***utilizing the Keurig Forecasts***." *Id.* (emphasis added). The Proxy further states that "[f]inancial data of Keurig ***was based on the Keurig Forecasts*** and publicly available research analysts' estimates (as calendarized to the extent specified above)." *Id.* (emphasis added). Likewise, with respect to the *Selected Public Companies* analysis performed by Credit Suisse, the Proxy states that "Credit Suisse noted that the calendar year 2016 estimated Adjusted EBITDA multiples observed for Keurig, ***based on the Keurig Forecasts*** and publicly available research analysts' estimates (as calendarized), were 7.9x and 7.8x, respectively." *Id.* at 58 (emphasis added). The Proxy further states that "Credit Suisse also noted that the calendar year 2016 estimated non-

GAAP EPS multiples observed for Keurig, ***based on the Keurig Forecasts*** and publicly available research analysts' estimates (as calendarized), were 15.9x and 15.1x, respectively." *Id.* (emphasis added). The Proxy further states that "Credit Suisse then applied selected ranges of calendar year 2016 estimated EBITDA and calendar year 2016 estimated EPS multiples of 7.5x to 12.0x and 15.0x to 22.0x, respectively, derived from the selected companies to the fiscal year 2016 estimated Adjusted EBITDA and fiscal year 2016 estimated non-GAAP EPS of Keurig ***utilizing the Keurig Forecasts***." *Id.* (emphasis added). The Proxy further states that "[f]inancial data of Keurig was ***based on the Keurig Forecasts*** and publicly available research analysts' estimates (as calendarized to the extent specified above)." *Id.* (emphasis added). The Proxy's reference to the "Keurig Forecasts" underlying each banker's *Selected Public Companies analysis* is materially misleading because the projections disclosed in the Proxy (*Id.* at 43), which are titled "Financial Projections," are divided into Keurig's "hot" business and "Kold" business, and the Proxy does not disclose whether the banks relied on the hot projections, the Kold projections, or both, and whether their analysis applied a probability weighting to the projections relied on, as well as the amount of that weighting, if any.

      (b)   ***Financial metrics underlying Credit Suisse's DFC sensitivity analysis.*** With respect to BofA Merrill Lynch's *Discounted Cashflow Analysis*, the Proxy states that "certain sensitivities to the estimated present value of the unlevered, after-tax free cash flows that Keurig's Kold businesses were forecasted to generate during the fiscal years ending September 24, 2016 through September 27, 2025, assuming probability-weightings of 100% and 0% to such cash flows in fiscal year September 25, 2021 and subsequent fiscal years and utilizing the same methodology as described above under '– Discounted Cash Flow Analysis,' which indicated approximate implied per share equity value reference ranges ***for Keurig*** of $92.50 to $145.25 and $47.00 to $71.00,

- 22 -

respectively." Proxy at 51 (emphasis added). With respect to Credit Suisse's *Discounted Cashflow Analysis*, the Proxy states that "certain sensitivities to the estimated present value of the unlevered, after-tax free cash flows that Keurig's Kold businesses were forecasted to generate during the fiscal years ending September 24, 2016 through September 27, 2025, assuming probability-weightings of 100% and 0% to such cash flows in fiscal year September 25, 2021 and subsequent fiscal years and utilizing the same methodology as described above under "– Discounted Cash Flow Analysis," which indicated approximate implied per share equity value reference ranges *for Keurig's Kold* businesses of $35.93 to $63.65 and $(9.39) to $(9.82), respectively[.]" *Id.* at 61 (emphasis added). Defendants' failure to disclose Credit Suisse's sensitivity analysis for Keurig as a whole, rather than Keurig Kold only, renders the analysis materially misleading as Keurig shareholders do not have enough information to evaluate the results of Credit Suisse's sensitivity analysis with respect to the value of the Company as a whole.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action individually and as a class action on behalf of the Class. Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

73.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

74.     *Numerosity.* The Class is so numerous that joinder of all members is impracticable. According to Keurig's most recent Form 10-Q filing with the SEC, there were over 148 million shares of Keurig common stock as of November 13, 2015.

75.     *Commonality.* There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, but are not limited to, the following:

(a)     whether Defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing, and disseminating a false and misleading Proxy; and

(b)     whether plaintiff and the members of the Class would be irreparably harmed were the transactions complained of herein consummated.

76.     ***Typicality.*** Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

77.     ***Adequacy of Representation.*** Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

78.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

79.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

80.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Claim for Violations of §14(a) of the 1934 Act and SEC Rule 14a-9
### Against All Defendants

81.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

82.     The Company and its Board disseminated the false and materially misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, the Proxy fails to disclose material information regarding: (a) discussions and reasoning underlying management's recommendation to apply a 50% probability weighting to Keurig Kold; (b) details of discussions between senior management and JAB Holdings; (c) information regarding Keurig's inherent value and prospects as a standalone company; (d) discussions and reasoning underlying the Board's failure to seek out other bidders; and (e) information and discussions regarding conflicts of interest with respect to BofA Merrill Lynch and Credit Suisse.

83.     Keurig prepared, reviewed, and/or disseminated the Proxy following review, editing, and approval by the Board and the Buyout Group. Defendants therefore, knew that the Proxy failed to disclose the aforementioned material information, which rendered other statements made in the Proxy false and/or misleading.

84.     The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Buyout. In addition, a reasonable investor would have viewed full and accurate disclosures as significantly altering the "total mix" of information made available in the Proxy and other information reasonably available to investors.

85.     By reason of the foregoing, Defendants violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

86.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the other Class members be fully protected from irreparable injury that they will surely face absent Court intervention.

## COUNT II

### Claim for Violations of §20(a) of the 1934 Act
### Against the Individual Defendants and the Buyout Group

87.     Plaintiff incorporates by reference and realleges the allegations in ¶¶1-80, above, as though fully set forth herein.

88.     The Individual Defendants and the Buyout Group acted as controlling persons of Keurig within the meaning of §20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements in the Proxy.

89.     Each of the Individual Defendants and the Buyout Group were provided with or had unlimited access to copies of the Proxy and the other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the 1934 Act violations alleged herein, and exercised the same. The Proxy contained the unanimous recommendation of each of the Board members to approve the Proposed Buyout. They were, thus, directly involved in the making of the Proxy.

91.     In addition, as the Proxy sets forth at length, and as described herein, the Board members were each involved in reviewing and approving the Proposed Buyout. The Proxy purports

to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Board.

92.     As set forth above, the Individual Defendants and the Buyout Group had the ability to exercise control over, and did control, a person or persons who have each violated §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading Proxy.

93.     By virtue of these facts, the Individual Defendants and the Buyout Group have violated §20(a) of the 1934 Act and are liable to plaintiff and the other members of the Class.

94.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the other members of the Class be fully protected from irreparable injury that they will surely face absent Court intervention.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in favor of plaintiff and the Class, and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying plaintiff as Class representative and plaintiff's counsel as Class counsel;

B.     Declaring that the Proxy distributed to Keurig shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.     Enjoining Defendants from holding the shareholder vote on the Proposed Buyout unless and until the Individual Defendants disclose all material information to the Company's shareholders;

D.     Awarding plaintiff and the Class compensatory and/or rescissory damages against Defendants;

E.    Awarding plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

F.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

G.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff and the Class demand a trial by jury.

DATED: January 27, 2016

WOODWARD & KELLEY, PLLC
PHILIP WOODWARD


PHILIP WOODWARD

1233 Shelburne Road, Suite D-3
South Burlington, VT 05403
Telephone: 802/652-9955
Facsimile: 802/652-9922

ROBBINS GELLER RUDMAN
    & DOWD LLP
STUART A. DAVIDSON
MARK J. DEARMAN
CHRISTOPHER MARTINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
Facsimile: 561/750-3364

ROBBINS GELLER RUDMAN
    & DOWD LLP
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
Facsimile: 619/231-7423

DUNNAM & DUNNAM, L.L.P.
HAMILTON P. LINDLEY
4125 West Waco Drive
Waco, TX  76710
Telephone:  254/753-6437
Facsimile: 254/753-7434

***Attorneys for Plaintiff and the Proposed Class***

I:\Admin\CptDraft\Deal\CPT Keurig.docx

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

KYLE MONTANIO ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: Plaintiff holds 40 shares of Keurig Green Mountain, Inc. stock as of the date of the certification and was a holder of Keurig Green Mountain, Inc. at all relevant times.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _26___ day of __January_____, 2016.

/s/ Kyle Montanio
KYLE MONTANIO