UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 FEB 16  PM 2: 26

CLERK

BY _____

DEPUTY CLERK

KYLE MONTANIO, Individually and on )
Behalf of All Others Similarly Situated, )
)
    Plaintiff, )
)
    v. )          Case No. 5:16-cv-19
)
KEURIG GREEN MOUNTAIN, INC., )
BRIAN P. KELLEY, NORMAN H. )
WESLEY, BARBARA D. CARLINI, JOHN )
D. HAYES, A.D. DAVID MACKAY, )
MICHAEL J. MARDY, HINDA MILLER, )
DAVID E. MORAN, JOSÉ OCTAVIO )
REYES LAGUNES, SUSAN SALTZBART )
KILSBY, ROBERT A. STEELE, JAB )
HOLDINGS B.V., ACORN HOLDINGS )
B.V., and MAPLE HOLDINGS )
ACQUISITION CORP., )
)
    Defendants. )

**OPINION AND ORDER ON MOTIONS TO DISMISS**
**(Docs. 27, 32)**

    This is a direct shareholder class action lawsuit in which the lead plaintiff,

Kyle Montanio, a former shareholder of Keurig Green Mountain, Inc. ("Keurig"), has sued

Keurig, Keurig's former CEO, members of Keurig's former Board of Directors, and the

corporate investors that bought out Keurig in a deal completed in March 2016. He alleges that,

in connection with the proposed merger, Defendants disseminated a materially false and

misleading proxy statement, in violation of Sections 14(a) and 20(a) of the Securities Exchange

Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9. Defendants

have moved to dismiss the complaint for failure to state a claim. (Docs. 27, 32.)

The court held a hearing on the motion on September 14, 2016. Counsel was allowed until September 26 to file posthearing memoranda. No supplemental filings were made and the motion was taken under advisement on September 26, 2016.

The complaint names the following defendants: Keurig Green Mountain, Inc.; Brian Kelley (former CEO of Keurig and a former member of its Board); Norman Wesley (former Chairman of the Board); the following former members of the Board: Barbara Carlini, John Hayes, A.D. David Mackay, Michael Mardy, Hinda Miller, David Moran, José Reyes Lagunes, Susan Kilsby, and Robert Steele; JAB Holdings B.V. (the company that bought Keurig); Acorn Holdings B.V. (a subsidiary of JAB Holdings); and Maple Holdings Acquisition Corp. (a subsidiary of Acorn). (Doc. 22 ¶¶ 21–37.)

## Facts

The following facts are taken from the complaint and the documents incorporated by reference into the complaint (primarily the proxy statement in question). *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

Keurig is best known for its line of Keurig Hot brewing systems—countertop kitchen and office appliances that brew single servings of coffee, tea, and other beverages through the use of small "K-Cup" pods filled with coffee grounds, tea leaves, or other bases. (Doc. 22 ¶ 40.) The Keurig hot brewers were quite successful, and through 2014, the company's financial prospects were bright. In the fourth quarter of fiscal year 2014, Keurig achieved 14% revenue growth for the quarter and 8% for the year. Its stock reached a high of $154.27 per share in November 2014. (*Id.* 42–45.)

During 2014 Keurig began developing a new appliance, dubbed Keurig Kold, that would allow consumers to make cold beverages instantly from single-serving pods. (Doc. 22 ¶ 47.)

The Kold was to be "game changing" with a "rapid chilling system" and a "carbonation process." (*Id.*) Like the K-Cups for the hot brewers, single-serving pods for the Keurig Kold would be available from a variety of popular soft drink brands. (*Id.*) The company invested more than $125 million in the development of the Kold system. (*Id.* ¶ 56.)

Coca-Cola was particularly interested in Keurig and the Keurig Kold system. In February 2014, it acquired a 10% stake in Keurig (it would later increase its stake to 17.4%, becoming Keurig's largest shareholder) and signed a 10-year agreement to develop Coca-Cola branded products for the Kold system. (Doc. 22 ¶¶ 46–48.)

Throughout 2014 and early 2015, Keurig's management, including its CEO Brian Kelley, were optimistic about the future success of Kold. According to the complaint, they "heavily hyped" the Kold system in quarterly and yearly earnings announcements. (Doc. 22 ¶¶ 49–53, 59–62.) At the same time, however, those statements reported weaker-than-expected revenue from the Keurig hot brewers and pods. (*Id.* ¶ 58.) The statements emphasized that the lower revenue was based only on transitory factors. (*Id.* ¶¶ 59–60.)

In January 2015, "Party X" approached Kelley about a possible merger with Keurig. (Doc. 22 ¶ 54.) Party X offered to pay a premium over Keurig's stock price—then $129.00—but Keurig's management and Board of Directors declined to seriously consider the offer, in light of the "value creation potential from the long-term growth of the Keurig hot system, *the anticipated launch of the Keurig Kold system* later in 2015 and subsequent *opportunities* to provide products in other *high-margin cold beverage categories using the Kold system.*" (Doc. 22 ¶ 54.)[1] Party X

---

[1] The complaint frequently uses typeface that is both italicized and bolded. The court has followed the italics, but has omitted the bold typeface for the sake of clarity. The court also omits intellectual property symbols from any passages quoted from either the complaint or the proxy statement.

again inquired about acquiring Keurig on June 22, but Kelley again "dismissed Party X in light of the projected success of Keurig Kold." (*Id.* ¶ 54.)

A month later, Olivier Goudet, the CEO of JAB Holdings, inquired about acquiring Keurig. (Doc. 22 ¶ 64.) At a meeting on July 21, 2015, Goudet told Kelley and Frances Rathke, Keurig's Chief Financial Officer, that "further developing a relationship with Keurig was a top priority of JAB Holding." (*Id.* ¶ 65.)

On August 26 and 27, 2015, members of the Board met with senior management to discuss Keurig's difficulties in 2015 and anticipated challenges in 2016. At this meeting, management provided the Board with updated "financial projections that had initially been prepared for and shared only with financing sources in connection with Keurig's new credit facility earlier in 2015." (Doc. 28-2 at 43; *accord* Doc. 22 ¶ 67.) The projections estimated that the revenue from Keurig Kold would grow substantially and that by 2022, it would even surpass the expected revenues for Keurig hot brewers. (Doc. 22 ¶ 56.) At a meeting on August 28, Goudet again told Kelley and Rathke that JAB Holdings still wanted to "develop a relationship with Keurig," but Kelley informed him that Keurig was not for sale. (*Id.* ¶ 68; Doc. 28-2 at 43.)

On September 11, at a meeting between representatives of Keurig and Party X, a representative of Party X stated that it was no longer interested in acquiring Keurig. (Doc. 22 ¶ 99; Doc. 28-19 at 3.)

Keurig formally launched Keurig Kold on September 29, 2015. (Doc. 22 ¶ 57.)

A little more than a week later, Goudet telephoned Kelley asking to meet for dinner because he had a "'very compelling' proposal to make." (Doc. 22 ¶ 69.) At the dinner, on October 15, Goudet made his initial offer: JAB Holdings would acquire Keurig for $85.00 in cash per share. (*Id.*) The Board rejected the offer as too low at a meeting on October 19, and

eight days later, Goudet increased the offer to $88.00 per share. (*Id.* ¶ 70–71.)  JAB Holdings

representatives also specified that it would withdraw the offer if Keurig attempted to generate

competing bids.  (Doc. 28-2 at 46.)

According to Plaintiff, this offer "was nowhere near the ballpark of fair value for

Keurig," and the Board members knew it. (Doc. 22 ¶¶ 72–73.)  Party X had been willing in June

to pay more than $129.00 per share for the company.  Because the Board was now interested in

selling the company to JAB Holdings, they needed "to develop a creative way to artificially

lower the Company's value in order to support a deal price that JAB Holdings would be willing

to pay." (*Id.* ¶ 73.)  "Keurig management discovered that by applying a range of probability

weighting percentages to the success of Keurig Kold, they could arbitrarily slash their own

projections of the future value of the Keurig Kold line, thereby dropping the value of the

Company overall, in order to support virtually any price that JAB Holdings would ultimately

agree to pay." (*Id.* ¶ 75.)  But, Plaintiff alleges, the Board did not embrace a particular

probability scenario "until *after* the parties agreed on the ultimate deal price," thereby ensuring

that the estimated value of the company would be commensurate with the final share price

offered by JAB Holdings.  (*Id.*)

The Board first considered the $88.00 per share offer at an in-person meeting on

November 12, 2015.  (Doc. 28-2 at 46.)  Together with senior management, the Board reviewed

"ten-year financial projection materials, which were based on the August 2015 financial

projections made available to the Board but had been revised to reflect management's

preliminary fiscal 2016 budget . . . and updated views on Keurig's fiscal 2016 and longer-term

financial performance." (Doc. 28-2 at 46.)  Then, with Keurig's financial advisors—Bank of

America Merrill Lynch ("BofA Merrill Lynch") and Credit Suisse—the Board "began to discuss

'preliminary financial perspectives regarding … Keurig's Kold business *based on different probability scenarios* regarding the success of that new business,'" and authorized continued negotiations with JAB Holdings.  (Doc. 22 ¶ 75; Doc. 28-2 at 46.)

JAB Holdings increased their offer price to $92.00 per share on November 29 after a week of negotiation.  (Doc. 22 ¶ 76.)  On December 1, the Board and management considered the offer and returned to the question of the appropriate "probability weighting" for Keurig Kold's future success.  (Doc. 28-2 at 49.)  With a final offer price in hand, "[m]anagement recommended a 50% probability weighting for Keurig's Kold business in the fiscal year ending September 25, 2021 and subsequent fiscal years as an appropriate adjustment given the risks associated with the launch of the new platform," and the Board agreed.  (Doc. 28-2 at 49; Doc. 22 ¶ 76.)  It "directed BofA Merrill Lynch and Credit Suisse to use the 50% probability weighting" for their financial analyses of the deal.  (Doc. 22 ¶ 76.)

At a board meeting on December 6, BofA Merrill Lynch and Credit Suisse both informed the Board that, based on the Board's preferred 50% probability weighting and other factors, the offer of $92.00 per share was "fair, from a financial point of view," to holders of Keurig common stock.[2]  (Doc. 28-2 at 50.)  The Board then unanimously approved the merger and the deal was announced the next day.  (*Id.*)

Keurig issued a proxy statement to obtain shareholder support of the merger on January 12, 2016.  (Doc. 22 ¶ 92; Doc. 28-2.)  The proxy statement outlines the merger agreement, provides background information on the negotiations of the merger, details the conduct of senior management and the Board during those negotiations, includes the financial projections for Keurig (both with and without the 50% probability weighting applied), includes

---

[2] The offer of $92.00 per share was a 78% premium over the stock price on December 5. (Doc. 28-2 at 51.)

financial analyses of the proposed merger by Keurig's two financial advisors (BofA Merrill Lynch and Credit Suisse), and includes the Board's recommendation that shareholders vote in favor of the merger.  (Doc. 28-2.)

Two weeks later, Plaintiff filed suit, alleging that the proxy statement was materially false and misleading.  (Doc. 1.)  Keurig issued supplemental disclosures on February 16. (Doc. 28-19; Doc. 22 ¶ 99.)  The deal was approved by shareholders on February 24, and on March 3, the merger was officially consummated.  (Doc. 22 ¶ 104.)  Plaintiff filed an amended complaint, the one at issue here, on April 27.  (Doc. 22.)

The complaint alleges five specific ways in which the proxy statement was materially false and misleading: (1) the Board's recommendation of the 50% probability weighting was false and misleading and the proxy failed to disclose a sufficient basis or enough background supporting that recommendation (Doc. 22 ¶¶ 78–79, 95–96); (2) the proxy failed to disclose "any details or discussions" regarding the Board's consideration of alternative scenarios for Keurig (*Id.* ¶ 97); (3) it failed to disclose any basis for the Board's belief that other parties would not be able to offer a higher price for Keurig, even though Party X had made such an offer in June 2015 (*Id.* ¶¶ 98–99); (4) it failed to "disclose any details of management's discussions with Goudet" and whether management had discussed continued roles with Keurig or opportunities to invest after the buyout (*Id.* ¶¶ 100–02); and (5) it failed to disclose the meaning of "Keurig forecasts" in its summary of the financial analyses of BofA Merrill Lynch and Credit Suisse, and so made it unclear whether that term refers to the "Financial Projections" disclosed earlier in the proxy or to a different, undisclosed set of financial forecasts (*Id.* ¶¶ 103–05).

<u>ANALYSIS</u>

## I.      Applicable Legal Standards

Before reaching the merits of the parties' arguments, the court addresses two initial

issues: elements of claims under Section 14(a) and Section 20(a) of the Securities Exchange Act

of 1934, and the elevated pleading standard required by the Private Securities Litigation Reform

Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1).

Section 14(a) prohibits the solicitation of proxies "in contravention of such rules and

regulations as the Commission may prescribe as necessary or appropriate in the public interest or

for the protection of investors." 15 U.S.C. § 78n(a). Rule 14a-9(a) prohibits solicitations

"containing any statement which, at the time and in the light of the circumstances under which it

is made, is false or misleading with respect to any material fact, or which omits to state any

material fact necessary in order to make the statements therein non false or misleading."

17 C.F.R. § 240.14a-9(a).

To state a claim under these provisions (collectively "Section 14(a)"), a plaintiff must

allege that: "(1) a proxy statement contained a material misrepresentation or omission, which

(2) caused plaintiffs' injury, and (3) that the proxy solicitation itself, rather than the particular

defect in the solicitation materials, was an essential link in the accomplishment of the

transaction." *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004);

*accord Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y.

2009).

"An omitted fact is material if there is a substantial likelihood that a reasonable

shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway,

Inc.*, 426 U.S. 438, 449 (1976); *accord Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090

(1991). In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449.

A statement of a corporate board's reasoning, belief, or opinion can also be actionable as a material misrepresentation under Section 14(a). *Va. Bankshares*, 501 U.S. at 1095–96. The Supreme Court recognized in *Virginia Bankshares* that such statements "are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed." *Id.* at 1092. The Court held that such statements are "knowingly false or misleadingly incomplete" only if they are false in both senses. *Id.* at 1095–96. The statements must be subjectively false—they misstate the actual opinions, beliefs, or motivation of the speaker—*and* they must be objectively false— "false or misleading with respect to the underlying subject matter [the statements] address." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011) (citing *Va. Bankshares*, 501 U.S. at 1091–96); *accord Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 153–54 (S.D.N.Y. 2004).

Claims under Section 14(a) are also subject to the heightened pleading standard imposed by the PSLRA, 15 U.S.C. § 78u-4(b). *Bond Opportunity Fund*, 87 F. App'x at 773; *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 213 (S.D.N.Y. 2004). That section requires that a complaint alleging that defendants "made an untrue statement of material fact" or omitted material facts, thereby making their statements misleading, must: (1) "specify each statement alleged to have been misleading"; (2) "the reason or reasons why the statement is misleading"; and (3) "if an allegation regarding the statement or omission is made on

9

information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), establishes derivative liability for any person who controls another person who violates securities laws.[3] To state a claim, a complaint must allege (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks and alterations omitted). Because plaintiffs must adequately allege a "primary violation"—here the plaintiff's claim under Section 14(a)—a failure to do so necessarily means that any related claims under Section 20(a) also fail. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014); *Wilson v. Dalene*, 699 F. Supp. 2d 534, 550 (E.D.N.Y. 2010).

## II.    Allegations in the Complaint

The court now turns to the merits of the claims as they appear in the First Amended Complaint. (Doc. 22.) The court's task is to review the allegations critically for detail and substance under the PSLRA and then to square the allegations against the elements of the cause of action for false statements made in a proxy filing.

### A.    Section 14(a)

In support of his claim under Section 14(a), Plaintiff alleges five categories of misrepresentations or omissions of material fact. The court will take each category in turn.

---

[3] "Person" is defined to include non-corporeal entities, including companies, political subdivisions, and government agencies. 15 U.S.C. § 78c(a)(9).

### 1.     The 50% Probability Weighting

The complaint's allegations can be understood as alleging two distinct, but related, ways in which the proxy is materially false and misleading with regard to the Board's recommendation of the 50% probability weighting.  First, they can be interpreted as allegations that the Board's recommendation of the weighting was a false and misleading opinion—that it was subjectively false (the Board did not actually believe that the 50% probability weighting was appropriate) and that it was objectively false (the 50% probability weighting was an incorrect characterization of Keurig Kold's future prospects).  Second, the allegations suggest that material omission of certain background facts and discussions relating to the 50% probability weighting render specific statements in the proxy misleading.

### a.     Falsity of Opinion

To adequately allege that a statement of opinion is materially misleading, a complaint "must allege[,] with particularity[,] provable facts to demonstrate that the statement of opinion is both objectively and subjectively false." *Fisher v. Kanas*, 467 F. Supp. 2d 275, 282 (E.D.N.Y. 2006) (internal quotation marks omitted); *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015).  In other words, the complaint must allege "that [Defendants] did not actually hold the belief or opinion stated, and that the opinion stated was in fact incorrect." *Fisher*, 467 F. Supp. 2d at 282 (internal quotation marks omitted).

The complaint alleges that the probability weighting was nothing more than a "creative way to artificially lower the Company's value in order to support a deal price that JAB Holding would be willing to pay." (Doc. 22 ¶ 73.)  The probability weighting was designed to "arbitrarily slash [management's] own projections of the future value of the Keurig Kold line." (*Id.* ¶ 75.) And, while the Board began discussing various probability weightings while negotiating the

buyout, it "did not decide on an exact probability . . . until *after* the parties agreed on the ultimate deal price." (*Id.* ¶ 75.)  Nor, according to the complaint, did the Board's recommendation of the 50% probability weighting have any "basis in logic or fact." (*Id.* ¶ 78.)  In "the 19 months leading up to the heavily hyped launch of Keurig Kold, Defendants gave no inclination that they doubted the success of Keurig Kold for one second." (*Id.*)  Management and Kelley were so confident that in June, Kelley had rejected a substantially higher offer from Party X "based on '*the anticipated launch of the Keurig Kold system.*'" (*Id.*)

The court begins with the question of whether the complaint adequately alleges that the opinion in favor of the 50% probability weighting was *subjectively* false.  The complaint alleges that the Board began considering different probability scenarios only when faced with JAB Holdings' merger offer, and only decided "on an exact probability . . . *after* the parties agreed on the ultimate deal price." (Doc. 22 ¶ 75.)  Thus, according to Plaintiff, the 50% probability weighting was selected, not for its accuracy, but because it made the final offer from JAB Holdings appear fair. (*Id.* ¶ 73)  The allegations in the complaint—and in particular the fact that the probability weighting was not selected until after the final offer from JAB Holdings—are sufficient to meet this standard.  *See In re Hot Topic, Inc. Sec. Litig.*, No. CV 13-02939, 2014 WL 7499375, at *7 (C.D. Cal. May 2, 2014).

The court next addresses the question of whether the opinion in favor of the 50% probability weighting was *objectively* false.  Plaintiff directs the court's attention to *In re Hot Topic*, 2014 WL 7499375. (Doc. 33 at 14–16.)  In that case, the court evaluated whether a Board's endorsement in a proxy of newer, less-optimistic financial projections in recommending a buyout was a material misstatement when several factors showed that older financial projections were more accurate and reliable.  *Id.* at *5.  In 2010, Hot Topic (a company

12

that operates a variety of retail stores primarily aimed at the teen market), "embarked on a plan to revitalize the company." *Id.* at *1–2. During this period, the company "consistently met or exceeded its own projections and goals," including those laid out in the company's "LRP Projections." *Id.* at *2. Then, after an offer to buy the company in late 2012, board members realized the LRP Projections were too optimistic and "would be problematic in any change-of-control situation." *Id.* Working with a financial advisor, the board created the "Revised Projections," which "assumed a slower build out of new stores" and lowered estimates of growth in various categories. *Id.* Although the board provided the buyout group with the more favorable LRP Projections, it directed its financial advisor to use the Revised Projections in reaching an opinion on the fairness of the proposal. *Id.* at *2, 6. The proxy statement recommending the buyout "described the Revised Projections as 'better reflect[ing] what management believed the Company would be able to achieve during the next five years compared to the LRP Projections.'" *Id.* at *2–3.

The *Hot Topic* court concluded that these allegations stated a claim under Section 14(a). *Id.* at *5–8. In concluding that the board's statement—that the Revised Projections were more accurate than the LRP Projections—was objectively false, the court relied on allegations of several "flawed and inaccurate assumptions" underlying the Revised Projections: (1) the Revised Projections "moderated downwards" estimates of growth of Torrid, a division of Hot Topic whose growth had previously been praised as "the major highlight" in quarterly reports; (2) the Revised Projections "assumed a slower build out of stores than the LRP projections," which was "contrary to the Company's stated goals to continue to open" new stores; (3) the Revised Projections lowered estimates of gross revenue growth, despite "the Company's strong

improvements in this area between 2010 and 2012." *Id.* at *6.  Additionally, Hot Topic provided

the buyers with the LRP Projections, but not the Revised Projections.  *Id.*

     Similar factors do not demonstrate that Defendants' opinion regarding the 50%

probability weighting as an appropriate adjustment was objectively false.  In *Hot Topic*, the

company measured its success in light of the LRP projections and the company frequently met or

exceeded those projections.  But in this case, the earlier projections (those without the

50% probability weighting), were never actually used as a benchmark for the company's success

(because Keurig Kold had not yet been released).  Consequently, application of the

50% probability weighting did not (and could not) contradict a recent history of success.  In

comparison, in *Hot Topic*, the Revised Projections contained reduced estimates of growth which

were contrary to recent stated success.

     It is true, as Plaintiff argues, that the 50% probability weighting is in tension with earlier

statements made in quarterly earnings disclosures that Keurig was optimistic about the

"opportunity" that Keurig Kold's introduction presented.[4]  But these general statements are not

"provable facts" that could demonstrate that the endorsement of the probability weighting was

objectively false.  Moreover, they were all made *before* Keurig Kold was placed on the market,

and were frequently accompanied by statements cautioning against overreliance on the "forward-

---

[4] In August 2014, Kelley stated that "[w]e also are excited about . . . our progress on the
new Keurig Cold beverage system." (Doc. 22 ¶ 52; Doc. 28-12 at 2.)  In November 2014, Kelley
stated that "we remain focused on what we believe is a significant opportunity to grow and
premiumize home beverages in both our hot and cold platforms." (Doc. 22 ¶ 53; Doc. 28-6 at 2.)
In February 2015, Kelley stated that "we remain very enthusiastic about our opportunity to grow
and premiumize at-home beverages across both our hot and cold platforms." (Doc. 22 ¶ 60; Doc.
28-7 at 2.)  In May 2015, Kelley stated that "[c]ombined with the upcoming launch of our Keurig
KOLD system, we expect the Keurig brand to further expand and globalize while continuing to
transform the premium home beverage experience for consumers." (Doc. 22 ¶ 61; Doc. 28-11
at 2.)  In August 2015, Kelley stated that, "the upcoming launch of our Keurig KOLD system
creates an even larger opportunity for long-term growth and value creation." (Doc. 22 ¶ 62;
Doc. 28-10 at 2.)

looking statements" in the disclosures and statements that the company had not met certain earnings goals. (*See, e.g.*, Doc. 28-6 at 3; Doc. 28-7 at 2–3; Doc. 28-11 at 2–3.)

To prove that a projection of future performance—in this case, performance commencing five years in the future—is objectively false requires allegations of specific, provable facts to the contrary. *See Ridler v. Hutchinson Tech. Inc.*, – F. Supp. 3d – , 2016 WL 6246767, at *6 (D. Minn. Oct. 25, 2016) (holding that plaintiffs failed to allege objective falsity because they "point to no objective flaw in Merrill Lynch's analysis, but only to a disagreement over subjective valuation methodology"). In *Hot Topic*, the court found such allegations in the manipulation of multiple assumptions and variables to support the insiders' preferred projections. There are no similar allegations here. Like any other figure, an estimate can be objectively false. A Vermont resident could publish an estimate that temperatures will be in the low 80s next January, but that estimate is objectively false because it flies in the face of years of lived experience. Here, there was neither past experience with the Kold product line nor other relevant information supporting the claim that the 50% probability weighting was objectively false. *Cf. City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671–72 (6th Cir. 2005) (concluding that statement by a tire manufacturer that "objective data clearly reinforces our belief that these are high-quality, safe tires" was actionable statement of opinion when, at the time of the statement, consumers had filed several lawsuits alleging that the tires in question malfunctioned and caused rollovers and automobile safety advocates had urged recall of cars outfitted with tires (internal quotation marks omitted)). Regardless of its members' subjective motives, the Board cannot be plausibly accused of concealing or making up information because no such information has been identified by Plaintiff. Instead, the 50% probability weighting is a warning that projected earnings in the period 5–10 years from the date of the proxy must be

15

treated with caution and significantly discounted as a basis for valuation due to the untried nature of the product. Accordingly, the court concludes that the complaint fails to allege that Defendants' use of the 50% probability weighting was objectively false. The complaint therefore fails to allege that Defendants' use of the 50% probability weighting was materially misleading.

### b.     Material Omissions

The court now addresses the related challenge to the 50% probability weighting—that the proxy materially omits background facts that rendered important statements in the proxy materially misleading. In support of this conclusion, the complaint alleges that "[t]he Proxy is utterly devoid of any information or discussions regarding the critical decision regarding the probability weighting to be applie[d] to Keurig Kold." (Doc. 22 ¶ 77.) The complaint identifies the following specific omissions: the different probability weightings management considered appropriate prior to JAB Holdings' initial offer, the "range of [probability] scenarios" considered by the Board, and any "factors or discussions" that supported management's recommendation of a 50% probability weighting and the Board's adoption of that recommendation at the December 1, 2015 meeting. (*Id.* ¶¶ 95–96.) According to the complaint, these omissions rendered the following statements materially misleading: that management recommended the 50% probability weighting, that the Board agreed with that recommendation, that the Board believed the buyout to be fair, and that the Board therefore recommended that shareholders vote in favor of the buyout. (*Id.*)

First, as Defendants point out, the proxy actually *does* provide some explanation for management's recommendation of a 50% probability weighting. (Doc. 28 at 20–21; Doc. 51 at 16.) The proxy describes the discussion on December 1 regarding the 50% probability weighting as follows:

The Board then focused on the probability weighting used in connection with scenarios regarding Keurig's Kold business. Management recommended a 50% probability weighting for Keurig's Kold business in the fiscal year ending September 25, 2021 and subsequent fiscal years as an appropriate adjustment given the risks associated with the launch of the new platform. *The 50% probability-weighted scenario was also deemed by senior management to be appropriate to adjust for the application of Keurig's discount rate (9% to 11%) in calculating the discounted cash flow valuation of the Kold business, which was essentially a start-up business (and, thus, would normally be ascribed a much higher discount rate).* The Board agreed with management's recommendation and directed BofA Merrill Lynch and Credit Suisse to use the 50% probability weighting for Keurig's Kold business as discussed in connection with their respective financial analyses and opinions.

(Doc. 28-2 at 49 (emphasis added).) When the complaint quotes from this paragraph, it omits the italicized text. (Doc. 22 ¶¶ 76, 96.)

This explanation is sufficient. Proxy statements need not be, and indeed, should not be, an exhaustive catalog of all information that might conceivably be helpful to a shareholder. *See TSC Industries*, 426 U.S. at 448 (explaining that materiality standard cannot be "unnecessarily low," otherwise management might simply "bury the shareholders in an avalanche of trivial information"). As a general matter, courts have concluded that "financial projections, forward-looking statements, puffing, or other soft financial information need not be disclosed." *Brown v. Brewer*, No. CV 06-3731, 2010 WL 2472182, at *20 (C.D. Cal. June 17, 2010) (internal quotation marks omitted); *accord In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004); *Himmel v. Bucyrus Int'l, Inc.*, Nos. 10-C-1104, 10-C-1106, 10-C-1179, 2014 WL 1406279, at *15 (E.D. Wis. Apr. 11, 2014); *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, No. 11-cv-222, 2012 WL 928402, at *12 (D. Vt. Mar. 19, 2012). Where valuation information or financial projections are disclosed, however, "that information must be complete and accurate." *Himmel*, 2014 WL 1406279, at *15. But Plaintiffs do not allege that the projections included are incomplete or inaccurate. They instead allege that the proxy should have included "the range of [probability] scenarios reviewed," "discussions . . .

17

regarding the different probability scenarios," and any other "details regarding the factors and discussions" that supported the 50% probability weighting.  (Doc. 22 ¶¶ 95–96.)

The absence of this information does not render any statements in the proxy misleading. A reasonable shareholder would be unlikely to put much faith in the financial projections for a new product line, with or without the application of the 50% probability weighting.  Ten-year projections are generally speculative, *see Himmel*, 2014 WL 1406279, at *16, and here, the probability weighting applied only to the last five years of the projections and then, only to the projected "unlevered free cash flow" for one untested product line—Keurig Kold.  (Doc. 28-2 at 58.)  Moreover, the proxy listed the assumptions on which the projections relied and warned shareholders of their limited value in any event: "You are cautioned not to place undue reliance on the financial projections . . . they are susceptible to multiple interpretations and frequent revisions based on actual experience and business developments."  (Doc. 28-2 at 56–57.)

There is another reason that the absence of more background information on the adoption of the 50% probability weighting does not render any statements in the proxy misleading.  The probability weighting was the adjustment of only a *single* variable—the probable likelihood of the company meeting its projections for Keurig Kold five to ten years in the future.  It is not the case, as it was in *Hot Topic*, that the Board adopted new projections that included adjustments in multiple variables and assumptions—including the rate of "build out of new stores," "the growth of outlet stores, gross margin expansion, and revenue and margin contributions from new concepts"—and then justified the new projections with an unsupported statement that the newer projections "better reflect[] what management believed the Company would be able to achieve" in comparison to the older ones.  2014 WL 7499375, at *2–3, 6.  In that context, a reasonable shareholder would have found "the relative accuracy and achievability of the two projections

helpful. *Id.* at *8.  Here, in comparison, the proxy offers a reasoned justification for the single adjustment embodied in the 50% probability weighting—it was "deemed . . . to be appropriate to adjust for the application of Keurig's discount rate (9% to 11%) in calculating the discounted cash flow valuation of the Kold business, which was essentially a start-up business (and, thus, would normally be ascribed a much higher discount rate)."  (Doc. 28-2 at 49.)

Nor is this a case in which underlying projections or assumptions have been omitted from a proxy that includes valuation information or financial projections.  For instance, the proxy did not omit the financial projections on which the fairness analysis by a financial advisor was based. *See Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013); *Brown*, 2010 WL 2472182, at *20–21.

Plaintiff insists that the explanation offered in the proxy is insufficient in light of "all other public statements made about the Company and Kold, as well as management's repeated reliance on the Kold Projections up until JAB submitted its first low offer."  (Doc. 33 at 13.)  As noted in the previous section, in several announcements of quarterly financial results in 2014 and 2015, Kelley expressed optimism regarding the future success of Keurig Kold.  Throughout the complaint, Plaintiff relies on these announcements to illustrate Keurig's enthusiasm and optimism for the upcoming release of Keurig Kold, and to frame the 50% probability weighting in opposition to that optimism.  And to demonstrate the Board's reliance on the projections, the complaint cites a meeting on August 26 and 27, 2015, at which management provided the Board with an "updated" version of the "financial projections" that would later be subject to the 50% probability weighting.  (Doc. 22 ¶ 67; Doc. 28-2 at 44.)

The court is unpersuaded.  First, as Defendants point out, the quarterly announcements also contain cautionary language regarding the "risks and uncertainties" that the forward-looking

statements are subject to, as well as the fact that Keurig was not meeting its revenue goals. (*See, e.g.*, Doc. 28-8 at 2, 4; Doc. 28-10 at 2, 5; Doc. 28-11 at 2–3.)  Plaintiff responds, citing *United Paperworkers International Union v. International Paper Co.*, 985 F.2d 1190, 1199–1200 (2d Cir. 1993), and *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999), that those statements should not be considered part of the "total mix of information reasonably available" to shareholders because they were not distributed to the shareholders voting on the proposal in the proxy.  (Doc. 33 at 17 (internal quotation marks omitted)).

The disclosure of "factors and discussions" regarding the adoption of the 50% probability weighting would not have "significantly altered" the "total mix" of information available to shareholders, regardless of whether these statements are included or excluded from the "total mix."  If the optimistic statements regarding Keurig Kold from the quarterly disclosures are included, then so are the statements cautioning against overreliance on them, which reduces any conflict between the optimistic statements and the probability weighting.  If the statements are excluded, then the total mix does not contain any tension that would need to be resolved by disclosure of the "factors and discussions."  Nor does the fact that the Board previously discussed or considered the financial projections mean that the Board must extensively justify in the proxy its decision to apply a probability weighting to part of those projections.

The court concludes that the complaint fails to state a claim that the proxy materially omitted any background information or discussions relating to the adoption of the 50% probability weighting by the Board.

### 2.    Alternative Scenarios to the Buyout

Second, the complaint alleges that the proxy statement failed to disclose the details of the Board's various discussions on November 12, 2015, November 30, and December 1, regarding

"potential alternatives for a return to capital to Keurig's stockholders," "alternative valuation scenarios" for Keurig Kold, and "alternative standalone scenarios" for Keurig compared to the buyout.  (Doc. 22 ¶ 97.)  These omissions, Plaintiff alleges, rendered the proxy's recommendation of the buyout misleading because shareholders "were unable to assess Keurig's inherent value and future prospects as a standalone company."  (*Id.* ¶ 97.)

The court notes that the proxy is not quite as bare regarding alternative scenarios as Plaintiff asserts.  It is true, as the complaint states, that in the section of the proxy entitled "Background of the Merger," the proxy only mentions that various alternatives were considered. (Doc. 28-2 at 46, 48–49.)  But in a subsequent section, entitled "Reasons for Recommending the Adoption of the Merger Agreement," the proxy specifies what kinds of alternative scenarios were considered and specifies the various aspects of those scenarios discussed:

> The Board considered other potential strategic alternatives available to Keurig, including alternative standalone operating strategies and potential strategic partnerships, in each case, considering the potential stockholder value that might result from such alternatives, as well as the feasibility of such alternatives and the risks and uncertainties associated with pursuing such alternatives.

(Doc. 28-2 at 52.)

Defendants argue that the absence of additional facts or background in the proxy regarding the Board's discussion of various alternatives to the buyout—including Keurig's potential value as a standalone corporation—is not a material omission from the proxy.  (Doc. 28 at 24–25.)  They contend that proxies need not disclose every strategic alternative.

The weight of authority agrees with this proposition.  *See City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Tr., Inc.*, 635 F. Supp. 2d 783, 795 (N.D. Ill. 2009) ("Section 14(a) and Rule 14a-9 do not require corporate officers and directors to present every strategic alternative to the recommended transaction.");  *Kahn v. Wien*, 842 F. Supp. 667, 677 (E.D.N.Y. 1994) ("The securities laws do not require that a proxy solicitation discuss all of

the arguments against, or all of the alternatives to, the proposed course of action."); *Umbriac v. Kaiser*, 467 F. Supp. 548, 553 (D. Nev. 1979) ("[M]anagement is not required to discuss the panoply of possible alternatives to the course of action it is proposing, absent perhaps some suggestion that the route not chosen was so well recognized and legally sound that the failure to pursue it demands consideration.").

Plaintiff argues that the complaint "does not seek a discussion of the 'panoply of possible alternatives,'" but "only an accurate portrayal of the alternatives to the Buyout, and the Proxy disclosed none." (Doc. 33 at 19 n.11.)  He directs the court's attention to *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850 (S.D. Ohio 2013).  In that case, according to the allegations, senior management, on its own initiative, actively sought to shop the company or make other significant changes to its structure. *Id.* at 857.  Management, without the Board's knowledge or authorization, received detailed presentations from two different financial advisors on strategic alternatives. *Id.*  One advisor presented two alternatives (selling the company or acquiring other businesses) and the other advisor presented four alternatives and provided a per-share discounted cash flow valuation for each of those alternatives: selling the company ($71.46), acquiring other businesses ($69.45), share repurchases ($65.14), and a "reverse Morris Trust" ($73.77). *Id.* Over the next several months, management pursued a sale of the company to the exclusion of alternative strategies, repeatedly overstepped the board's directives, and continually failed to inform the board of its conduct. *Id.*  The board eventually recommended a buyout that would pay $60 per share. *Id.* at 856.

In addition to several other material misrepresentations or omissions, the court in *Smith* found that the proxy had materially omitted information regarding the strategic alternatives. *Id.* at 869–70.  Specifically, the court concluded that the proxy had failed to disclose "the extent to

which the Board was aware of and disregarded" the second financial advisor's presentation of four strategic alternatives, and "that the Board deliberately disregarded its duty to analyze the value of the strategic alternatives in comparison to the $60 Merger consideration." *Id.* at 869. These specifically-alleged omissions "demonstrated that the Company could pursue strategic alternatives that promised greater long-term value" than the $60 per share consideration of the buyout, and made it impossible to determine "whether the Board was fully informed about the fairness of the Merger consideration." *Id.* at 869–70.

Plaintiff's complaint in this case makes no such specific allegations. The complaint alleges only that the proxy "fail[ed] to disclose *any details or discussions* regarding potential alternatives, . . . alternative valuation scenarios for Keurig's Kold business, or [] alternative standalone scenarios" considered by the Board. (Doc. 22 ¶ 97 (internal quotation marks omitted, emphasis added).) Plaintiff has not identified any *specific* fact that it believes was omitted. Merely asking for more detail or background regarding a particular decision is insufficient. *See Washtenaw Cty. Emps.' Ret. Sys. v. Wells Real Estate Inv. Tr., Inc.*, No. 1:07-CV-862, 2008 WL 2302679, at *9 (N.D. Ga. Mar. 31, 2008) ("Shareholders were informed that after considering alternatives such as continuing as a going concern, potential liquidation of assets, or potential Listing, the Board recommended the Internalization. It appears that the plaintiff is merely arguing that more detail should have been given about the viability of the alternatives to listing. The court finds, however, that the Proxy disclosed all material information on the consideration of alternatives for the Company." (citation omitted)); *see also meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 635 (S.D.N.Y. 2003) (concluding that allegation was insufficient to state claim under § 14(a) where Plaintiff wanted proxy to "include a detailed plan outlining their vision for MVC's future," but did not

"suggest any specific information or facts that were omitted" from the proxy materials with the exception of the identity of a "potential investment adviser") .

Accordingly, the court finds that the complaint fails to state a claim that there were material omissions from the proxy related to any strategic alternatives or alternative scenarios considered by the Board.

### 3.   Other Potential Buyers

The third material omission specified in the complaint concerns the absence of any basis supporting the proxy's statement that the Board did not believe that "other potentially interested parties" would offer to buy Keurig at a higher price than JAB Holdings had offered.  (Doc. 22 ¶ 98.)  In light of Party X's offer in January 2015 to buy Keurig at a price of $129.00 per share and Party X's expression of interest again in June 2015, Plaintiff asserts that this omission rendered materially misleading the proxy's statement that other parties would not be interested in buying Keurig.  (*Id.* ¶ 98.)

But the amended complaint characterizes this claim as "partially mooted," in light of the supplemental disclosures made after the filing of the first complaint in this case, without saying what aspects of the claim remain viable.  (Doc. 22 ¶ 99.)  Those disclosures state that, at a meeting on September 11, 2015, Party X informed Keurig that it was no longer interested in acquiring Keurig.  (*Id.* ¶ 99; Doc. 28-19 at 3.)  Additionally, Plaintiff did not defend this claim in his briefing or at argument, where his counsel stated that "the real issue here . . . is the probability weighting."  (Doc. 33; Doc. 51 at 53.)

The court discerns no sufficient allegations regarding material omissions relating to the Board's statement that it did not believe that other parties would offer a higher price than the $92.00 per share offered by JAB Holdings.

### 4.   Management's Motivations for Recommending the Buyout

The fourth asserted material omission concerns the absence of "any details of management's discussions with Goudet" in the summer of 2015 when the proposed buyout was still in its infancy.  (Doc. 22 ¶ 100.)  According to the complaint, this omission renders the proxy's statement that Kelley and Goudet spoke only of "Keurig's partnership with Peet's and Caribou with respect to K-Cup pods" materially misleading because shareholders were unable to assess whether management had negotiated the merger with an eye toward protecting their continued employment with Keurig or the possibility of investing in Keurig alongside JAB Holdings after the merger.  (*Id.* ¶ 100.)

But this issue too, according to the amended complaint, has been "partially mooted" by the supplemental disclosures, which provided details regarding the meeting on October 15, 2015 between Keurig and JAB Holdings and the Board's meeting on December 6, 2015.  (Doc. 22 ¶¶ 101–02; Doc. 28-19 at 3–4.)  On October 15, according to the supplemental disclosure, representatives of JAB Holdings informed Kelley (Keurig's CEO) and Wesley (the Chairman of Keurig's Board) that JAB Holdings "may or may not retain existing management" of businesses it buys.  (Doc. 22 ¶ 101; Doc. 28–19 at 3.)  At the December 6 meeting, Kelley "confirmed to the Board that neither he nor any member of management had engaged in any discussions about a post-closing role with Keurig, nor a rollover of their equity positions."  (Doc. 22 ¶ 101; Doc. 28-19 at 4.)

As with the third category of alleged material omissions, Plaintiff did not defend these allegations in either his briefing or at argument.

The supplemental disclosures were directly responsive to Plaintiff's concerns.  The complaint does not identify specific omissions relating to conversations between management and JAB Holdings and management's motivations for recommending the buyout.

### 5.   "Keurig Forecasts" and "Financial Projections"

Finally, the complaint alleges that the proxy is misleading because the proxy's summary of the financial analyses of both BofA Merrill Lynch and Credit Suisse states that the analyses are based on the "Keurig Forecasts," while "the only projections disclosed in the proxy are titled '*Financial Projections*.'"  (Doc. 22 ¶ 103 (citation omitted).)  According to the complaint, the "repeated reference to 'Keurig Forecasts' renders the Proxy's disclosure of the 'Keurig Projections' materially false and misleading" because it is impossible to determine whether the advisors' analyses were "based on the Financial Projections disclosed in the Proxy or on an undisclosed set" of different financial forecasts.  (*Id.*)

But the proxy makes clear that there is no distinction between "Keurig Forecasts," as that term is used by the financial advisors, and the "Financial Projections" included in the proxy.  The proxy states that the "financial projections" were prepared by management and provided to the Board, and "also provided to BofA Merrill Lynch and Credit Suisse for their use and reliance in connection with their respective financial analyses and opinions.  (Doc. 28-2 at 55.)  In BofA's financial opinion, the "Keurig Forecasts" are defined as "certain financial forecasts related to Keurig prepared by the management of Keurig."  (*Id.* at 60.)  In Credit Suisse's opinion, the "Keurig Forecasts" are defined as "financial forecasts . . . relating to Keurig prepared by the management of Keurig."  (*Id.* at 70.)

Accordingly, the complaint does not allege that the proxy was materially misleading regarding which financial forecasts were used by the financial advisors in their opinions.

### 6.      Conclusion Regarding Section 14(a) Claim

The court concludes that the complaint fails to state a claim against any Defendants under Section 14(a).

The court need not consider Defendants' other arguments: that the complaint fails to adequately plead loss causation (Doc. 28 at 23–25) or that the complaint fails to state a claim against Defendant Maple Holdings specifically because Maple did not "solicit" the proxies in question (Doc. 32-1 at 7–10).

### B.      Section 20(a)

As noted above, a complaint must plausibly allege a "primary violation" to establish derivative liability under Section 20(a), 15 U.S.C. § 78t(a).  Because the complaint fails to allege a claim under Section 14(a), Plaintiff also fails to state a claim under Section 20(a).  *See Special Situations Fund*, 33 F. Supp. 3d at 437.

The court need not consider Defendant Maple's argument that it lacked the control over a primary violator required for liability under Section 20(a).  (Doc. 32-1 at 10–15.)

<u>Conclusion</u>

The court concludes that the amended complaint fails to state a claim against Defendants. Accordingly, Defendants' Motions to Dismiss (Docs. 27, 32) are GRANTED.  The case is DISMISSED WITH PREJUDICE.

Dated at Rutland, in the District of Vermont, this ⎰day of February, 2017.

Geoffrey W. Crawford, Judge
United States District Court